BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Acting Chief, Criminal Division

ANDREW M. SCOBLE (CABN 124940)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7249
FAX: (415) 436-7234
Email: andrew.scoble@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAIME BALAM,<br><br>Defendant. | NO. CR 12-0625 WHA<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Sent. Hrg.: November 1, 2016<br>Time: 2:00 p.m.<br>Courtroom: Eight (19th Floor) |

**INTRODUCTION**

Pursuant to the parties' written plea agreement, and in conformity with the Sentencing Recommendation of the United States Probation Office, the government respectfully requests that the Court sentence Jaime Balam as follows: a term of imprisonment of **twenty-seven and one-half years (330 months)**; five years of supervised release, with the conditions as specified by the U.S. Probation Office (and including the expanded search condition set forth in Paragraph 8 of the plea agreement; a total of $900 in special assessments; and restitution of $21,650 (to be owed jointly and severally with Danilo Velasquez, and reduced by any payments already made by Velasquez). The defendant has already agreed, as a provision of his written plea agreement, that he abandons all interest in the Lorcin

.380-cal. semi-automatic firearm (serial number 132371) which he has admitted using on February 19, 2009 attack.[1]

This recommendation comports with that set forth in the Presentence Report (PSR). *See* PSR, Sentencing Recommendation. The PSR recommends, as does the government, that the Court grant a variance in imposing the sentence. Further, as the PSR Sentencing Recommendation indicates, the Court should impose all sentences to run concurrently, in amounts that acknowledge the applicable statutory maximums, with the exception of the 120-month sentence for Count 9, which must be consecutive.

Specifically, on August 16, 2016, the defendant entered guilty pleas to Counts One, Two, Three, Five through Seven, Eight, Nine, and Ten of the indictment, which charged him, respectively, with: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5); (3) conspiracy to commit assault with a dangerous weapon in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(6); (4) three counts of attempted murder in aid of racketeering activity, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1959(a)(5) and 2; (5) using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence, and causing death thereby, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(j)(1) and 2; (6) using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; and (7) knowingly possessing a firearm and ammunition while being an alien illegally in the United States, in violation of 18 U.S.C. § 922(g)(5).

Pursuant to the parties' written plea agreement, the government will move at sentencing to dismiss Count Four of the indictment. That count charged a violation of 18 U.S.C. §§ 1959(a)(1) and 2 (murder in aid of racketeering; aiding and abetting), and carries a mandatory sentence of life in prison.

/ /

/ /

/ /

[1] For this reason, the government does not seek a forfeiture judgment as part of the criminal sentence.

## THE OFFENSE CONDUCT

### A. Overview

The principal charges against Jaime Balam involve a shooting in front of the Daly City BART Station on February 19, 2009. On that day, Balam and other members of the 20th Street clique of *La Mara Salvatrucha* (or "MS-13"), followed a car containing four young men. Two of the MS-13 gang members, Danilo Velasquez and Jaime Balam, fired at the four victims. The shooters believed – in error – that they were firing upon gang rivals.

The government presented evidence of the February 19, 2009 Daly City BART Station shooting at the 2011 trial of defendants Danilo Velasquez and Luis Herrera. Defendant Luis Herrera pleaded guilty to various racketeering-related charges pursuant to a written plea agreement after the start of that trial. In November 2011, the federal jury returned verdicts of guilty on all four counts against defendant Velasquez. Then, based on evidence developed for presentation at that trial, the government pursued an investigation of Jaime Balam, ultimately obtaining a ten-count indictment from a federal grand jury in August 2012. He was arrested in Mexico in October 2013, and was extradited to the United States in February 2015. He entered his guilty pleas on August 16, 2016.

Jaime Balam was "jumped in" to the 20th Street clique of *La Mara Salvatrucha* in 2008 (hereafter "20th Street"). With membership came the obligation to perform *jale* ("work") on behalf of the gang. *Jales* often took the form of acts of violence designed to protect and enhance MS-13 and 20th Street's territorial claims and reputation. Many of the acts of violence committed by 20th Street members were directed at known members of the rival *Norteño* street gang, which also operates in San Francisco and the San Francisco Bay Area.

On February 19, 2009, members of 20th Street agreed to join their street leader Danilo Velasquez in a "hunt" for rival *Norteño* gang members. Gang member Luis Herrera drove a stolen Honda with defendant Balam and street leader Velasquez in the passenger seats. Velasquez was armed with a Cobray Tec-9 M-11 semi-automatic pistol; Balam was armed with a .380-caliber Lorcin semi-automatic pistol (SN 132371). Two other gang members followed in a second stolen Honda.

The 20th Street gang members focused on a car containing four young Hispanic males. Velasquez and his fellow gang members believed that the four were rival *Norteño* gang members. In

fact, the four victims were not gang members, but rather four high school friends on a regular Thursday evening outing for dinner and drinks.[2] As it happened, two of them wore white ball caps with piping in red, the color claimed by *Norteños*, and the four friends were playing loud hip hop music in their car.

Velasquez and his co-conspirators, including defendant Balam, began following their victims' car in the Excelsior District of San Francisco, which 20th Street members consider *Norteño* territory. When traffic stopped at a light in front of the Daly City BART Station, street leader Velasquez and defendant Balam jumped out of the car driven by Herrera, walked up to flank the car in which Moises Frias, Jr. was riding, and poured in gun fire from just outside the rear passenger windows. Frias, the left rear passenger, received multiple gunshot wounds from Balam's firearm and died shortly afterwards. The vehicle driver was shot in the neck, and the bullet ricocheted off his collarbone and lodged in the right side of his chest (where it remains). The right front passenger suffered four gunshot wounds in the neck, chest, and right arm, including a bullet lodged between his jugular vein and carotid artery. That victim's brother, seated next to Frias, miraculously escaped injury, but the ball cap he wore was pierced (and some of his hair clipped off) by a bullet fired from Velasquez's firearm.

After the shooting, Velasquez and Balam returned to the stolen Honda and Herrera drove off toward San Francisco. San Francisco Police found the Honda abandoned the following day in the Castro District of San Francisco. The firearm used by Balam was recovered by San Francisco Police officers on March 5, 2009 during a traffic stop effected in the Mission District of San Francisco; gang member Luis Herrera was one of the occupants of that car, and the officers learned that the gang members and associates in the car were engaged in a "hunt" for rivals to shoot. The firearm used by Velasquez was turned in to police by the mother of a juvenile in San Francisco about eight months later.

The defendant, Jaime Balam, was arrested in San Francisco within approximately one week of the shooting incident. Before his involvement in the shooting was known, he was deported to Mexico.

---

[2] Murder victim Moises Frias, Jr. was a San Francisco City College student supporting himself by working at the local water district. The right front passenger was a University of California, Berkeley graduate and an AT&T engineer. That passenger's brother, seated next to Moises Frias on the right side of the rear seat, was a law student at Hastings Law School. The driver was a Bank of America employee.

Following the 2011 trial of Danilo Velasquez and Luis Herrera, on August 21, 2012, a federal grand jury indicted Jaime Balam for, among other things, his involvement in the MS-13 racketeering enterprise and the February 19, 2009 murder and attempted murders. He was ultimately extradited to the Northern District of California.

On August 16, 2016, the defendant entered pleas of guilty to all but one count of the pending indictment.

**B. Defendant Balam's Factual Admissions**

In his written plea agreement, defendant Jaime Balam admitted the following:

> a. At all times relevant to this matter, an enterprise known as *La Mara Salvatrucha* (also known as MS-13) existed. MS-13 is an international gang that has members and operates in, among other places, El Salvador, Mexico, Honduras, and the United States. MS-13 members are a group of individuals associated in fact who are engaged in, and the activities of which affect, interstate and foreign commerce. MS-13 constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise. Among other crimes, MS-13 members are involved in murder, robbery, robbery of individuals who traffic in narcotics, other acts of violence, theft of vehicles, extortion affecting interstate commerce, narcotics trafficking, and witness tampering.
>
> b. Since at least in or about 2008, I was a member of MS-13 in the San Francisco Bay Area. I agreed with others to conduct and to participate in the conduct of the affairs of MS-13 through a pattern of racketeering activity. I agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of MS-13, including acts involving murder. To maintain and increase my position in MS-13, I agreed that a member of MS-13 would kill members of rival gangs (for instance, gang members called Norteños) and others who defied or betrayed MS-13, such as individuals who cooperated with law enforcement against the gang.
>
> c. On or about February 19, 2009, other MS-13 members (including Danilo Velasquez or "Triste" and Luis Herrera or "Killer") and I went hunting for Norteños in the southeastern part of San Francisco and the northeastern part of Daly City. "Hunting" meant looking for Norteños to kill. Luis Herrera drove a stolen Honda automobile during the hunt, while Velasquez and I rode as passengers in the car. In the vicinity of the Daly City BART Station, the three of us spotted a car stopped in traffic in which four apparent Norteños were riding. We stopped one or two vehicles behind the suspected Norteños' car, and Velasquez and I got out armed with guns. I had a Lorcin .380-caliber semiautomatic handgun (Serial Number 132371) with approximately seven rounds of CBC .380-caliber AUTO ammunition. Velasquez and I approached the suspected Norteños' car on foot from behind, and when we got close to it, we both opened fire at the suspected Norteños inside the car. After we shot the suspected Norteños, we got back into the car and Luis Herrera drove away. Velasquez, Herrera and I later abandoned the stolen Honda in San

> Francisco. Although I did not know the identities of the victims in the car, I stipulate that the shots that Velasquez and I fired killed Moises Frias and gravely wounded two other men in the car. I committed this crime to maintain and increase my position within MS-13.
>
> d. On or about February 19, 2009, I was an alien illegally and unlawfully in the United States. I stipulate that the Lorcin .380-caliber pistol I knowingly possessed, and the seven rounds of ammunition with which it was loaded, had all been manufactured outside California and so traveled across state lines in interstate commerce.

## DISCUSSION

### A. Applicable Law

Title 18, United States Code, Section 3553(a) directs the district court to consider a number of factors in determining the appropriate sentence to impose. In this case, these factors indicate that the sentence set forth in the parties' written plea agreement is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The key factors here are the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 2553(a)(1)), the need to afford adequate deterrence to criminal conduct (*id.* § 3553(a)(2)(B)), and the need to protect the public from further crimes of the defendant (*id.* § 3553(a)(2)(C)).

Although the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), has rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing, *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotation marks and citation omitted); *see Carty*, 520 F.3d at 991. While there is no presumption of reasonableness for a Guidelines-range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Carty*, 520 F.3d at 991-92 (citing *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence"). As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one." 552 U.S. at 50. Finally, "[a]s a general rule, the preponderance of the

evidence standard is the appropriate standard for factual findings used for sentencing." *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g., United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

**B. Sentencing the Defendant to the Agreed Upon Sentence Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a)**

The government agrees with the calculations and the recommendation set forth in the Presentence Report (PSR). As is set forth in the PSR, the sentence contained in the written plea agreement would be sufficient, but not greater than necessary, to achieve the goals of sentencing under 18 U.S.C. § 3553(a). The government believes that a variance from the advisory Guidelines range of 360 months to life is warranted by the factors identified in the PSR, especially the fact that this defendant had no known criminal history of violence prior to February 19, 2009, and in fact lived a seemingly law-abiding life. A sentence of 330 months should suffice to protect the public at large, to reflect the seriousness of the offense, and to provide a just punishment while avoiding unwarranted sentence disparities among defendants convicted of similar conduct.

The sentence includes an extremely lengthy term of imprisonment – 27½ years. That is more than the defendant's years of age at present. While it is true that this sentence is shorter than those imposed on Danilo Velasquez (life sentence, following trail) and Luis Herrera (35 years, pursuant to plea agreement after the start of trial), it must be noted that the February 19, 2009 murder and attempted murders, terrible as they were, appear to represent the sole instance of violence perpetrated by Jaime Balam. As the Court will recall, the offense conduct of both Danilo Velasquez and Luis Herrera included other examples of *jales* in which they engaged. Moreover, as noted in the PSR, Danilo Velasquez was the street leader of the 20th Street clique who organized the particular "hunt" for rivals on February 19, 2009 which led to the fatal shooting in front of the Daly City BART Station.

Moreover, the 27½-year sentence which the government respectfully requests for defendant Balam is in line with the 27-year sentences received by each of three defendants in *United States v. Davie Jimmy Mejia-Sensente, et al.*, CR 11-293 CRB. That case involved three MS-13 members who met an apparent gang rival on a bus and agreed to murder him at the end of the bus line in Daly City. One defendant got off the bus before the end of the line, but handed over the murder weapon to his

fellow gang members, who then followed the victim off the bus at the end of the line, caught up to him, and took turns firing the handgun at point blank range, fatally wounding him. All three defendants entered guilty pleas; each received a 27-year sentence.

Two final points bear note. First, by entering his guilty pleas in timely fashion, before filing any pretrial motions and well before the April 2017 trial date, defendant Jaime Balam has resolved the case and allowed the government – and the victims – to avoid the litigation hazards associated with trying the case for a second time and after a hiatus exceeding five years. Second, this resolution offers to the surviving victims and to the Frias family (who were consulted prior to the government's entry into the plea agreement) an opportunity for closure that avoids the pain of a second trial.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence Jaime Balam to: a total term of imprisonment of **twenty-seven and one-half years (330 months)**[3]; five years of supervised release, with the conditions as specified by the U.S. Probation Office (and including the expanded search condition set forth in Paragraph 8 of the plea agreement; a total of $900 in special assessments; and restitution of $21,650 (to be owed jointly and severally with Danilo Velasquez, and reduced by any payments already made by Velasquez).

Dated: October 19, 2016

BRIAN J. STRETCH
United States Attorney

/s/
By: ______________________
ANDREW M. SCOBLE
Assistant United States Attorney

[3] As the PSR recommends, the total sentence of 330 months should include a variance, and should be imposed as follows, in order to account for statutory maximums: Counts 1 and 8 (210 months, concurrent); Counts 2, 5-7, and 10 (120 months concurrent); count 3 (36 months, concurrent); Count 9 (120 months, consecutive to all other counts).